IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

HOBBS V. GOLDEN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DARIN HOBBS, APPELLEE,

V.

MONICA GOLDEN, APPELLANT.

Filed August 4, 2020.    No. A-19-748.

Appeal from the District Court for Douglas County: GARY B. RANDALL, Judge. Affirmed in part as modified, and in part reversed and remanded with directions.

Justin A. Quinn for appellant.

No appearance for appellee.

PIRTLE, BISHOP, and WELCH, Judges.

PIRTLE, Judge.

## INTRODUCTION

Monica Golden appeals from an order of the district court for Douglas County which denied her complaint to modify custody of her and Darin Hobbs' child and recalculated child support. She argues that a material change in circumstances existed to warrant modifying legal and physical custody and that the court erred in several respects in its calculation of child support. Having found error in the court's child support calculation, we affirm in part as modified, and in part reverse and remand with directions.

## BACKGROUND

Golden and Hobbs are the parents of a minor child named Darin, referred to by the parties as DJ, born July 2012. On January 16, 2014, Hobbs filed a complaint for establishment of paternity. In May, he was ordered to submit to a hair follicle test, the results of which were positive for

- 1 -

cocaine. In June, the court ordered Hobbs to submit to a hair follicle test every month for 4 consecutive months.

A decree of paternity was entered on February 4, 2015. The parenting plan was agreed to by the parties and adopted by the court. The parties were awarded joint legal and joint physical custody of DJ, and Golden was given ultimate decisionmaking authority when the parties could not come to a decision. In regard to parenting time, the parties agreed to an 8-day/6-day rotation. Golden was given 8 consecutive days from Sunday morning to the following Monday morning, and Hobbs was given the following 6 consecutive days from Monday morning to Sunday morning. Hobbs was ordered to pay $398 per month in child support.

In June 2015, Hobbs was charged with assaulting Golden by strangulation. The charge was dropped after Golden asked the prosecutor to do so because she needed Hobbs' financial support and would lose it if he went to jail and lost his job. Hobbs denied strangling Golden or laying hands on her at all and testified that he was the one who called the police the night of the alleged strangulation.

On April 5, 2018, Golden filed a complaint to modify alleging material changes in circumstances had occurred which included Hobbs' resuming use of cocaine, Hobbs' failure to exercise his parenting time, Hobbs' request that he not have overnight parenting time, Hobbs' domestic violence toward Golden, and Hobbs' refusal to communicate regarding DJ's medical and other needs. Golden sought sole legal and physical custody, as well as recalculation of child support based on the change in physical custody.

On April 6, 2018, Golden filed a motion to require Hobbs to take a hair follicle test based on her belief that he was using cocaine again. Her motion was granted, and his parenting time was suspended until he took the test and the results were known. Hobbs submitted to a test, which came back negative for all substances. Hobbs' parenting time was reinstated on April 19.

Hobbs subsequently filed an answer and counterclaim in response to Golden's complaint to modify. His counterclaim alleged that DJ had missed more than 15 days of school; Hobbs had been denied parenting time from January 24 to April 19, 2018; Golden had made false allegations of cocaine use; Golden had disparaged him and his fiance; and Golden put DJ in counseling without discussing it with him. Hobbs sought sole legal and physical custody and asked the court to recalculate child support. At the start of trial, however, Hobbs' counsel stated that Hobbs was requesting that joint legal and physical custody continue, with the exception that he be the one with final decisionmaking authority.

A trial was held in March 2019. At the time of trial, DJ was 6 years old and was in his second year of kindergarten. DJ repeated kindergarten because he was socially behind other children. Hobbs testified that he had concerns about DJ's school attendance during his first year of kindergarten, specifically between January and April 2018, but that DJ's attendance was no longer a concern. Hobbs testified that he stays involved with DJ's schooling and has regular contact with DJ's teacher, principal, and counselor.

DJ has some medical issues, including stomach/digestion problems and allergies. DJ was also born without enamel on his teeth so he goes to the dentist every 3 months for a fluoride rinse. Within a year before trial, DJ had a lump on his chest, which was surgically removed. When the lump was discovered and surgery was recommended, Golden and Hobbs disagreed about what to

do. Golden thought the mass should be removed right away, whereas Hobbs did not want DJ to go through surgery and wanted to get a second medical opinion. Hobbs testified that Golden made the decision to go ahead with the surgery.

Golden testified that Hobbs did not assist in taking DJ to and from doctor appointments, dentist appointments, or therapy appointments. Hobbs admitted that Golden was the one who made all of DJ's appointments and took him to the appointments. He stated that it had always been this way since DJ was born, even when the parties were together. Hobbs stated that although Golden had been the one who took DJ to his appointments, he believed he was capable of doing it.

Golden testified that DJ had participated in extracurricular activities including soccer, wrestling, and tumbling, and she was always the one who signed him up for the activities, paid for the activities, and took him to the activities. At the time of trial, DJ was not participating in any activities. Golden stated that she had not signed him up for anything because he would not be able to attend activities consistently as Hobbs would not take him during his parenting time. Hobbs admitted that he only went to one of DJ's soccer games, but stated that his work schedule conflicted with the games. He claimed he was involved with DJ's wrestling. He agreed that activities are important for DJ and that if Golden set them up and communicated with him, he would take DJ.

Golden testified that shortly after the decree was entered in February 2015, the parties started following a different parenting schedule where they shifted the schedule in the decree by 1 day. Golden's parenting time started on Monday instead of Sunday, and she had DJ until the following Tuesday. Hobbs' parenting time started on Tuesday, instead of Monday, and he had DJ until Monday. Hobbs testified that there was no agreement about shifting the exchange day, but that it was sort of forced upon him by Golden and he accepted it. He admitted that he actually liked it better than the days set forth in the decree. During this time, Hobbs had his own residence but would stay at Golden's home during his parenting time.

In June 2016, Hobbs stopped exercising his parenting time at Golden's home, but the parties continued to follow the same 8-day/6-day schedule shifted 1 day from what was set forth in the decree. Golden testified that starting in August 2016, Hobbs was only exercising his parenting time 1 or 2 days during his 6 days. This continued until January 2017. At that time, the parties changed the schedule so that Golden's time began on Sunday morning and ran 9 consecutive days until the following Tuesday, and Hobbs had DJ for 5 consecutive days from Tuesday until Sunday. Golden testified, however, that Hobbs did not exercise his 5 consecutive days of parenting time. She stated that he would take DJ a few times a week and would have him pretty consistently overnight on Saturdays.

Golden testified that in mid-December 2017, Hobbs was living with his girlfriend and they broke up and she removed all of the furniture from Hobbs' home. Golden testified that Hobbs told her he could not take DJ because he did not have anything in his house. She claimed that Hobbs had DJ overnight for only two nights in December.

Hobbs testified that he and his girlfriend, who was his fiance at the time of trial, broke up temporarily in December 2017 and she moved out, but he denied that she took all the furniture or that he told Golden he did not have a place for DJ to stay. Hobbs also testified that he exercised his regular parenting time in December.

Also in December 2017, Golden believed that Hobbs had started using cocaine again based on a conversation she had with Hobbs, as well as a reference DJ made to cocaine. Hobbs denied the alleged conversation with Golden.

Golden testified that between January and April 2018, Hobbs saw DJ only once. Golden testified that she was regularly trying to communicate with Hobbs by text messages during this time and that Hobbs could have picked up DJ from school on the Tuesdays that his parenting time started.

Hobbs claimed that Golden denied him parenting time between January and April 2018. He testified that he did not go to DJ's school to pick him up because he did not want to be accused of any wrong doing as he had in the past.

In February 2018, Golden told Hobbs that she had set up mediation in March so they could discuss a new parenting schedule. Hobbs testified that rather than argue with Golden, he decided to just wait and address his parenting time at mediation. The parties eventually met with a mediator but no agreement was reached. Golden subsequently filed her complaint to modify on April 5.

Golden testified that DJ began seeing a counselor in April 2018 because he had anxiety, was socially behind in school, was having trouble sleeping, and was clingy to his mother. He sees the counselor once a week. Hobbs refused to take DJ to therapy, requiring Golden to take him during Hobbs' parenting time. The trial court entered a temporary order in May 2018, requiring Hobbs to take DJ to therapy during his parenting time. Hobbs testified that when DJ started therapy, he did not believe DJ needed therapy but allowed him to go. He testified that he did not observe any of the concerning behaviors that Golden reported when DJ was in his home. Hobbs went to his first therapy session with DJ a few days before trial and testified that he would continue to attend in the future and support it.

Golden indicated that she and Hobbs do not get along and do not communicate well. They primarily communicate by text messages. There were numerous texts entered into evidence showing the limited and hostile communication between the parties. Golden testified that Hobbs is dismissive whenever she asks him about something related to DJ and that when he does express an opinion, it is consistently opposite with her opinion. She also claimed that Hobbs often has his fiance communicate with her about issues regarding DJ. Hobbs was asked if he and Golden get along, and he stated that he would like to because that is what is best for DJ and that he puts forth the effort. Hobbs testified that there were no longer issues with the exchanges, but there had been in the past. Hobbs testified that when the parties meet to exchange DJ, Golden looks the other way when he tries talking to her and she will not speak to him. He testified that for DJ's sake, the two of them should be friendly at the exchanges.

In regard to income, Golden testified that she works as a hair stylist. Golden presented evidence that showed she earned $21,807 in 2017 and $24,305 in 2018. In regard to health insurance for DJ, Golden testified that he is covered by Medicaid. She acknowledged that Hobbs had health insurance through his employer, but wanted to continue covering DJ with Medicaid as long as it was available.

Golden testified that in addition to DJ, she had a 13-year-old daughter from another relationship. Golden offered a child support order for her daughter into evidence, which showed that the total support for her according to the child support calculation was $792 per month, with

Golden's share being $445.42. She presented further evidence that she was not receiving regular child support from her daughter's father and that as of March 2019, he was $28,273.43 in arrears. Golden requested credit in the child support calculation for DJ in the amount of $792 per month, the amount of regular support she alleged she provides for her daughter.

Hobbs works for Burton Plumbing Services. He testified that he made $19 an hour and worked 40 hours per week, which equates to $3,293 per month. He used that amount as his total monthly income in his proposed child support calculation. He offered one pay stub into evidence for the pay period January 7 to January 20, 2018. Hobbs' 2018 tax return showed that he made $61,853 that year, or $5,154 per month. He stated that it was possible for him to earn commissions, but it was not guaranteed. However, he also indicated that he is paid one or the other--either an hourly wage or commissions, apparently whichever is greater. Hobbs testified that he continued to work for the same employer at the time of trial and that he had the same pay structure for 2019 as he did in 2018.

At the time of trial, Hobbs and his fiance had recently had a child together. Hobbs testified that he was not asking the court to consider the support he provides for his other child when calculating child support for DJ because he and Golden both have a child in addition to DJ. He testified that he should be ordered to pay $566 per month in child support for DJ. However, Hobbs' proposed child support worksheet accounted for his subsequent born child and calculated his obligation to be $406 per month. The one pay stub offered by Hobbs showed a deduction for health insurance of $137.70. Hobbs testified that the entire amount was to provide coverage for DJ, and he pays that amount every 2 weeks.

Veronica Olsen, DJ's therapist, also testified. She testified that she had been seeing DJ once a week since April 2018. She diagnosed him with adjustment disorder with mixed anxiety and depressed mood. She testified that Golden attended the sessions every week with DJ, whereas Hobbs only attended one session, 4 days prior to trial. Olsen testified that she spoke with Hobbs on the phone on two occasions and scheduled an informational session with Hobbs but he did not attend. Olsen testified that the lack of information she had from Hobbs was due to his own failure to report it and that Hobbs had always had the opportunity to participate in DJ's therapy.

Following trial, the court entered an order of modification nunc pro tunc. It found there was no material change in circumstances in regard to legal or physical custody. Physical custody was to continue on an 8-day/6-day rotation as set forth in the decree of paternity, but the court altered the Sunday exchange time. In regard to child support, it found there was a material change in circumstances and recalculated child support, ordering Hobbs to pay $406 per month.

## ASSIGNMENTS OF ERROR

Restated, Golden assigns that the trial court erred in (1) failing to find a material change in circumstances existed to warrant awarding her sole physical custody of DJ, (2) failing to find a material change in circumstances existed to warrant awarding her sole legal custody of DJ, and (3) its child support calculation.

STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

Modification of child support is entrusted to the discretion of the trial court. *Schwarz v. Schwarz*, 289 Neb. 960, 857 N.W.2d 802 (2015). An appellate court reviews proceedings for modification of child support de novo on the record and will affirm the judgment of the trial court absent an abuse of discretion. *Id.*

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason and evidence. *Schrag v. Spear, supra*. A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

ANALYSIS

*Physical Custody.*

Golden first assigns that the trial court erred in failing to find a material change in circumstances existed to warrant modifying physical custody, specifically, to award her sole physical custody of DJ. Prior to the modification of a child custody order, two steps of proof must be taken by the party seeking the modification. *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019). First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. *Id.* Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Id.* A material change in circumstances means the occurrence of something which, had it been known to the court at the time of the initial decree, would have persuaded the court to decree differently. *Schrag v. Spear, supra*. The party seeking modification of child custody bears the burden of showing a change in circumstances. *Id.*

In her complaint to modify, Golden alleged that the material changes in circumstances included Hobbs' resuming use of cocaine, Hobbs' failure to exercise his parenting time, Hobbs' request to not have DJ overnight, the domestic violence toward Golden, and Hobbs' refusal to communicate regarding DJ's medical and other needs. The trial court found no material change in circumstances to warrant a change of physical custody. After reviewing the record, we find that the trial court did not abuse its discretion in determining that Golden failed to demonstrate a material change in circumstances affecting the best interests of DJ.

When Golden filed her complaint to modify, she believed that Hobbs was using cocaine again. However, he submitted to a hair follicle test about a week after Golden filed her complaint to modify and the results showed no drug use.

Golden also claimed that Hobbs was not exercising his parenting time for several months before she filed her complaint to modify. She testified that Hobbs only saw DJ once between January and April 2018. Hobbs claimed that he did not see DJ during this time because Golden was denying him his parenting time. The parties presented conflicting evidence as to what

happened during these few months. The parties tried to mediate issues involving parenting time to no avail, and Golden filed her complaint to modify.

In regard to Golden's allegation that Hobbs requested to not have DJ overnight, the only evidence of this was Golden's testimony that in December 2017, Hobbs told Golden he did not have any place for DJ to stay because his girlfriend had moved out and taken all the furniture. Hobbs denied making this statement to Golden.

As to Hobbs' alleged refusal to communicate regarding DJ's medical and other needs, it is apparent from the record that the parties do not communicate well with each other. Their primary communication is by text messages. Golden alleged that she believes Hobbs' fiance, rather than Hobbs, is the one often texting her regarding issues involving DJ. Hobbs testified that when he tries to talk to Golden at exchanges, she will not speak to him. Hobbs believes he and Golden should try to get along for DJ's sake. Both parties need to work on their communication with each other. The lack of communication cannot be attributed solely to Hobbs.

Golden also alleged in her complaint to modify that Hobbs had committed domestic violence against her. There was an assault by strangulation charge filed in June 2015, but the charge was dismissed at Golden's request because she did not want to lose Hobbs' financial support. Hobbs denied that any domestic violence ever happened.

Golden and Hobbs presented conflicting testimony regarding many of the issues raised by Golden. In contested custody cases, where material issues of fact are in great dispute, the standard of review and the amount of deference granted to the trial judge, who heard and observed the witnesses testify, are often dispositive of whether the trial court's determination is affirmed or reversed on appeal. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). The trial court had an opportunity to observe the testimony of both parties and concluded that Golden, as the party seeking modification of child custody, failed to meet her burden of showing any one of the reasons offered by Golden in her complaint to modify constituted a material change in circumstances. We agree. Having found no material change in circumstances, we need not discuss whether changing DJ's custody is in his best interests. See *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019). Therefore, we conclude that the trial court did not abuse its discretion in denying Golden's request for modification of physical custody.

Golden further argues that if we determine that the trial court did not abuse its discretion in leaving joint physical custody in place, we should find that the court abused its discretion in failing to shift the 8-day/6-day schedule by 1 day. The court left the schedule as set forth in the decree of paternity. That is, Golden's 8 days ran from Sunday to the following Monday and Hobbs' 6 days ran from Monday to Sunday. Golden contends that the court should have modified her parenting time to start on Monday and continue to the following Tuesday, and Hobbs' parenting time would start on Tuesday and continue until Monday, as that is the schedule the parties were following. Both parties also testified this was the schedule they preferred.

As previously stated, the trial court found that no material change in circumstances existed in regard to physical custody. Accordingly, we cannot say that the trial court abused its discretion in failing to modify the parenting time schedule.

Golden also assigns that if we uphold the trial court's decision that nothing should be changed in regard to physical custody, the court erred by changing the exchange time on Sunday.

The decree stated that Golden's parenting time would start on Sunday morning and Hobbs' parenting time would end Sunday morning. In the order of modification nunc pro tunc, the court states that Golden's parenting time will start on Sunday morning and that Hobbs' parenting time will end on Sunday at 5 p.m. The court gave no explanation for changing the end time of Hobbs' parenting time. Not only did the court change the ending time of Hobbs' parenting time, it also made it inconsistent with the time Golden's parenting time is to start. Accordingly, we conclude that the court erred in changing the end time of Hobbs' parenting time. We modify the court's order to provide that on the Sundays that the parties exchange DJ, the exchange time is Sunday morning as set forth in the decree of paternity.

*Legal Custody.*

Golden next assigns that the trial court erred in failing to award her sole legal custody of DJ. As indicated above, custody of a minor child will not be modified unless there has been a material change in circumstances affecting the best interests of the child. See *Eric H. v. Ashley H., supra.*

Golden argues that legal custody should be modified because Hobbs was not participating in DJ's medical and dental appointments, therapy, or extracurricular activities to a sufficient degree to be given any decisionmaking authority over DJ. The parties agreed that Golden was the one who had always taken care of scheduling DJ's doctor and dentist appointments and taken him to the appointments. She was also the one who signed DJ up for extracurricular activities and took him to those activities. However, this is nothing new that has occurred since the initial decree and therefore, not a material change in circumstances. See *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015) (material change in circumstances means occurrence of something which, had it been known to court at time of initial decree, would have persuaded court to decree differently).

Golden also suggests that she should be given sole legal custody because Hobbs had not been taking DJ to his therapy sessions or attending the sessions. She had been the parent solely responsible for DJ's therapeutic needs. Although Hobbs had not been involved in DJ's therapy, he went to a session with DJ a few days before trial. He testified that if DJ's therapist thinks it is in DJ's best interests to continue therapy and have Hobbs involved, he would continue to attend on a regular basis and support it.

Golden also points out the disagreement she and Hobbs had about surgically removing the mass on DJ's chest. Golden wanted to have it removed right away, whereas Hobbs wanted to get a second opinion. However, the disagreement was resolved based on the provision in the decree of paternity that gives Golden final say in decisions when the parties cannot agree. The trial court left this provision in place and it can be relied on in the future when the parties cannot agree.

After reviewing the record, we conclude that the trial court did not abuse its discretion in finding no material change in circumstances existed to justify modifying legal custody.

*Child Support Calculation.*

Golden next assigns that the trial court abused its discretion in calculating Hobbs' child support obligation. Specifically, she alleges that the court erred in (1) finding that Hobbs' income was $3,293.33 per month, (2) giving Hobbs credit for his subsequently born child, (3) failing to

give her credit for the support she provides her other child, and (4) giving Hobbs credit for health insurance costs. Golden contends that if all these factors were appropriately considered, Hobbs should have been ordered to pay $578 per month under a joint physical custody arrangement, rather than $406 per month as the court ordered.

Golden first claims that the court erred in finding that Hobbs' income was $3,293.33 per month, or $39,520 annually. We agree. The court determined Hobbs' monthly income based on his testimony that he makes $19 per hour and works at least 40 hours per week. Hobbs also testified that commissions are possible but not guaranteed. However, he indicated that he is paid either an hourly wage or commissions, apparently whichever is greater. The only paystub Hobbs entered into evidence, from the pay period January 7 to January 20, 2018, showed gross earnings of $2,587.12, or roughly $5,174.24 per month (or $62,090.88 per year). It also showed that almost all of his earnings in that pay period were from commissions and not hourly pay. His 2018 tax return showed he earned $5,154.42 per month, or $61,853 that year. Hobbs testified that he continued to work for the same employer and that he had the same pay structure for 2019 as he did in 2018.

We determine that the trial court abused its discretion in finding that Hobbs' monthly income for child support purposes was $3,293.33 per month, where there was credible evidence that he made significantly more than that. The court should have relied on Hobbs' 2018 tax return and used $5,154.42 as his monthly income in calculating his child support obligation.

Golden next argues that the trial court erred in allowing Hobbs to deduct support for his subsequent child in determining his child support obligation for DJ and erred in failing to allow her to deduct support for her daughter.

Neb. Ct. R. § 4-205(E) of the Nebraska Child Support Guidelines provides that "credit may be given for biological or adopted children for whom the obligor provides regular support." The trial court has discretion to choose whether and how to calculate a deduction for subsequent children. *Schwarz v. Schwarz,* 289 Neb. 960, 857 N.W.2d 802 (2015). No precise mathematical formula exists for calculating child support when subsequent children are involved, but the court must perform the calculation in a manner that does not benefit one family at the expense of the other. *Id.* The party requesting a deduction for his or her obligation to support subsequent children bears the burden of providing evidence of the obligation, including the income of the other parent of the child. *Id.* Similarly, deductions for previously born children have been allowed in determining support for a subsequent child. See, e.g., *Barth v. Barth*, 22 Neb. App. 241, 851 N.W.2d 104 (2014). See, also, *Prochaska v. Prochaska*, 6 Neb. App. 302, 573 N.W.2d 777 (1998).

On Hobbs' proposed child support calculation, he indicated that his fiance had no income. However, on cross-examination, Hobbs stated that his fiance was a school teacher for Omaha Public Schools and that she has income. There was no evidence in regard to how much money she makes. In the trial court's child support calculation, it took into account Hobbs' subsequent born child and attributed zero income to his fiance. Without evidence of his fiance's income, Hobbs failed to present sufficient evidence for the court to calculate his obligation to that child. Accordingly, the trial court erred in allowing Hobbs to deduct support for his subsequent child in determining his obligation for DJ.

In regard to Golden's argument that the court erred in failing to deduct support for her daughter, Golden provided a child support worksheet for her daughter from 2010, which included the income of the father, and showed a total support amount of $792 per month. Golden's monthly share was $445.42 per month. She also presented evidence that the father of her daughter infrequently paid child support and, as of March 18, 2019, was $28,273.43 in arrears. Golden argues that she should be given a deduction of $792 per month because she provides nearly all of her daughter's support.

We determine that Golden presented sufficient documentation of her obligation to support her daughter. Although we do not agree that Golden should be given a deduction of $792 because the father's failure to pay child support should not ultimately increase Hobbs' obligation for DJ, we do conclude that the court erred in failing to give Golden any credit for her daughter. Golden should have been entitled to a credit of $445.42 per month for the support of her daughter in the child support calculation for DJ.

Golden next argues that that trial court abused its discretion by giving Hobbs credit for health insurance costs for DJ. The guidelines require a child support order to address how the parents will provide for the child's health care, and they allow the parent paying the premium a credit against his or her share of monthly support. See Neb. Ct. R. § 4-215.

The decree of paternity in the present case states: "The child shall be covered by Medicaid, if possible. If Medicaid does not cover the child, the party who has employment-related health insurance will cover the child." This provision of the decree was not altered by the court in the order of modification nunc pro tunc. Golden testified at the time of trial that she continued to have Medicaid coverage for DJ and that she wanted to continue using Medicaid as long as it was available. Hobbs testified that he has health insurance through his employer and that it covers DJ. However, there is no evidence that the court ordered Hobbs to provide health insurance coverage given that DJ was still being covered by Medicaid.

Under § 4-215, only the parent who is ordered to provide coverage for the child is entitled to a credit. See *Schwarz v. Schwarz*, 289 Neb. 960, 857 N.W.2d 802 (2015). Therefore, we conclude that the court erred by allowing Hobbs a deduction for the cost of health insurance coverage for DJ because the court did not order him to provide coverage.

In summary, we conclude that the court erred in its child support calculation in four ways: the income it used for Hobbs, allowing Hobbs a deduction for his subsequent child, failing to allow Golden a deduction for her daughter, and allowing Hobbs a deduction for health insurance premiums. Therefore, we reverse the court's child support calculation and remand with directions to recalculate Hobbs' obligation taking into account the errors noted in this opinion.

CONCLUSION

We conclude that the court did not err in finding that no material change in circumstances existed to warrant modification of physical and legal custody, but that the court did err in modifying the parties' exchange time on Sundays. We modify the court's order to provide that on the Sundays the parties exchange DJ, the exchange time is Sunday morning as set forth in the decree of paternity.

We further conclude that the court erred in calculating child support in several respects. Accordingly, we reverse the court's child support calculation and remand the cause with directions to recalculate Hobbs' obligation consistent with this opinion. The remainder of the court's order of modification nunc pro tunc is affirmed.

AFFIRMED IN PART AS MODIFIED, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.